IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | : : : : : : : : : | MDL No. 2:18-mn-2873-RMG<br><br>This Document Relates to:<br>Case No. 2:20-cv-00257-RMG<br>Case No. 2:20-cv-00209-RMG<br>Case No. 2:20-cv-00301-RMG<br>Case No. 2:21-cv-3181-RMG<br>Case No. 2:18-cv-03438-RMG |

**PLAINTIFFS' SUBMISSION FOR CONSOLIDATED TRIAL AND TRIAL SELECTIONS**

**I.     INTRODUCTION**

Plaintiffs Michael Bien, Brock Donnelly, Alex Field, Clinton Speers and Kevin Voelker, move for a consolidated trial, and, pursuant to Case Management Order No. 26G [ECF No. 6544], request that all five (5) cases move forward for a consolidated trial. Or, in the alternative, that the three (3) kidney cancers be consolidated as the initial bellwether trial followed by a consolidated trial involving the two (2) testicular cancer cases. Plaintiffs have consistently represented that the commonality within these bellwether cases in Trial Group A supports consolidation for trial purposes.

These cases involve many common and overlapping facts regarding liability and general causation, include the *same* medical specialty (urology), are based upon the *same* common facts involving ingestion of contaminated drinking water resulting from use of the *same* aqueous film forming foams ("AFFFs") in the very same community emanating from the very same source, utilizing the *same* law (Pennsylvania), against the *same* defendants,[1] who all have virtually the

---

[1] While presently there are varying named Defendants in the five (5) bellwether cases, the Defendants whose products have been identified at the relevant military bases (collectively

1

*same* defenses, share many of the *same* experts, and the *same* counsel in each case. Moreover, each of these Plaintiffs were heavily exposed to PFAS as a result of residing for decades in a community identified as highly contaminated, with average PFAS blood levels in the community at large far above the national average.[2] These commonalities present good grounds for grouping these actions together for trial purposes to promote the just, speedy, and inexpensive determination of this proceeding.[3]

The multi-plaintiff trial contemplated here will benefit this MDL, which "allow[s] federal courts to 'conserv[e] judicial resources in situations where multiple cases involving common questions of fact [are] filed in different districts.'"[4] Conducting bellwether trials is "beneficial to the MDL process," because they "provide meaningful information, experience, and data to allow

---

referred to herein as Willow Grove) include: 3M, Tyco/Chemguard, BASF/Ciba, Clariant, DuPont, and Carrier/National Foam/Kidde (given the bankruptcy proceeding involving Carrier/National Foam/Kidde, these entities will not be present leaving only five primary Defendants at trial all of whom are Defendants in all five bellwether cases). Notably, many of the peripheral Defendants whose products have not been identified in these cases have been served with notices of voluntary dismissal or are soon to be served by Plaintiffs' counsel and thus are also not anticipated to be at the personal injury bellwether trial. Arkema is the sole defendant named only in *Speers*. However, it is well-settled that consolidation of cases for trial despite different defendants in different cases is permissible. *See, e.g, Johnson v. Celotex Corp.*, 899 F.2d 1281, 1283 (2d Cir. 1990) (affirming verdict of consolidated asbestos trial with one plaintiff against three defendants and a second plaintiff against ten defendants). It is of no moment therefore as to whether or not Arkema for example, who has asserted a jurisdictional defense in the Speers case, is successful or not in their stated desire to be dismissed from that case.

Thus, any argument that a joint trial would be too complicated due to varying Defendants clearly rings hollow.

[2] Pennsylvania PFAS Multi-Site Study, "PA PFAS Health Study Update," available at: https://papfas.rti.org/PA_PFAS_MSS_Newsletter_March_2024.pdf.

[3] *See* Fed. R. Civ. P. 1.

[4] *In re Lipitor (Atorvastatin Calcium) Marketing, Sales Prac. & Prods. Liab. Litig. (NO II) MDL 2502*, 892 F.3d 624, 648 (4th Cir. 2018)) (citations omitted).

2

the parties to make an intelligent and informed decision as to the future course of the litigation."[5] Plaintiffs propose consolidation "of less than ten cases" for bellwether trial because it is recognized to be "an extremely effective tool in resolving disputes."[6] The parties, witnesses, community, and judicial system benefit from the "substantial savings of time and money that consolidation offers."[7] Moreover, Plaintiffs further propose that *Bien*, *Donnelly*, *Field*, *Speers* and *Voelker* be consolidated for trial because they are representative bellwether trial selections. Or, in the alternative, and for the reasons discussed below, Plaintiffs propose that the three (3) representative kidney cancer cases be consolidated as the initial trial.

Indeed, there is no reason that the same principles that were utilized to establish an efficient bellwether discovery process should not be applied here, and a joint trial be held. As noted in prior briefing, the bellwether discovery process was established in part to allow for a potential pathway to conduct multi-plaintiff trials by including plaintiffs with common factual and legal issues decided using only one state's law. Having a uniform choice of law removes one of the DCC's likely objections to a multi-plaintiff trial, and would also make it less burdensome and complex for the Court to instruct the jury.[8] The concept of dividing the bellwether process into two groups, *i.e.*, the Pennsylvania bellwether cases limited to cancer injuries from one exposure source under Pennsylvania law, and the Colorado cases limited to two additional *Leach* injuries (ulcerative colitis and thyroid disease), again, from one exposure source (Peterson Airforce Base) under Colorado law, created efficien*y* for the *discovery process*. That same concept can now provide

---

[5] Eldon E. Fallon, *Bellwether Trials*, UMKC Law Review,: Vol. 89: No. 4, Article 15 at 1 (2021).

[6] Francis E. McGovern, *Resolving Mature Mass Tort Litigation*, 69 B.U. L. Rev. 659, 688 (1989).

[7] *Campbell v. Boston Scientific Corp.*, 882 F.3d 70, 76 (4th Cir. 2018).

[8] Plaintiff Executive Committee's letter-brief in support of its Group A and Group B Tier 2 personal injury bellwether selections [ECF No. 5333], at 3.

3

the Court with the opportunity for efficiency during the *trial process* as well by conducting a joint trial involving a single state's laws, and plaintiffs that share a plethora of common facts.

Fed. R. Civ. P. 42(a) provides courts with broad authority to consolidate actions for a joint trial, including in one MDL involving PFAS chemicals, namely, *In re E. I. du Pont & Co. C-8 Personal Injury Litig.*, MDL No. 2433, before the Honorable Edmund A. Sargus in the Southern District of Ohio where two plaintiffs with different PFAS-related injuries (testicular and kidney cancer) were consolidated and proceeded in a joint trial.[9] Despite claims by Defendants of jury confusion, the jury was able to parse out the issues rendering a verdict in favor of one plaintiff, but not the other. Plaintiffs submit that exercising the Court's discretion in favor of a multi-plaintiff trial will effectuate the purpose of this MDL to efficiently conduct this litigation while minimizing the expenditure of legal and judicial resources.

For the reasons set forth below, Plaintiffs' motion should be granted.

## II. FACTUAL BACKGROUND

MDL 2873 was centralized on December 7, 2018, because numerous cases asserted that AFFF had contaminated local ground water and drinking water supplies around the United States.[10] Adjunct to the mandate of 28 U.S.C. 1407, the JPML held that the actions subject to transfer shared common issues of fact:

> These actions thus share factual questions concerning the toxicity of PFOA and PFOS and their effects on human health; the chemical properties of these substances and their propensity to migrate in groundwater supplies; the knowledge of the AFFF manufacturers regarding the dangers of PFOA and PFOS; their warnings, if any, regarding proper use and storage of AFFFs; and to what extent, if any, defendants

---

[9] *In re E.I. du Pont de Nemours and Co. C-8 Personal Injury Litig.*, MDL 2433, Pretrial Order No. 51-A (consolidating the Swartz and Abbott trials), attached as Ex. A.

[10] *See In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 357 F. Supp. 3d 1391, 1394 (JPML 2018).

4

conspired or cooperated to conceal the dangers of PFOA and PFOS in their products.[11]

Similarly, the common issues of law and fact presented by these five (5) cases favor consolidation for trial:

- These cases only involve Pennsylvania law.

- The same strict liability and negligence-type claims are asserted in each case.

- The same AFFF products and their component parts are at issue in each case.

- The trial of these cases will involve the presentation of evidence from the same witnesses – i.e., testimony from the same general causation experts for the Plaintiffs, the same specific causation expert, testimony from the same corporate witnesses, the same product identification witnesses who testified to their personal use of each product at each of the military bases from which it is alleged the contamination emanated, the same fate and transport expert whose fate and transport analysis would be virtually identical for each case.

- The evidence establishing liability and punitive damages significantly overlaps as between each defendant.

All five (5) Plaintiffs reside or have resided in the vicinity of the former Naval Air Station Joint Reserve Base Willow Grove in Horsham, Pennsylvania and adjacent Warminster Naval Air Weapons Center in Warminster, Pennsylvania (collectively "Willow Grove"). The activities on those facilities regularly involved the use and disposal of AFFF for fire suppression and training. No one disputes that these AFFF products contained fluorosurfactants. These fluorosurfactants made their way into the groundwater and were transported over time to various private and public drinking water wells. Ultimately, the contaminants were distributed in a 360-degree radius to the surrounding communities, thereby contaminating multiple public water systems, including the

---

[11] *Id.*

three that provided drinking water to each of the Plaintiffs[12] who regularly used this water for every purpose -- from drinking water to bathing, and other household uses. Their ingestion of the contaminated drinking water is alleged to have caused their injuries. In short, this exposure to Defendants' carcinogenic products puts each Plaintiff on a similar path to injury. Thus, their individual medical histories are a distinction relevant only to their damages, not to the commonality of defect or general causation.

Specifically, Plaintiffs Donnelly, Speers, and Voelker intend to prove their respective kidney cancers were caused by exposure to Defendants' products. Plaintiffs Bien and Field also intend to prove their respective testicular cancers were caused by exposure to Defendants' products.[13] Mr. Donnelly was exposed exclusively through the Warminster Municipal Authority ("WMA"); while Mr. Voelker was exposed primarily through WMA with some exposure from Horsham Water & Sewer Authority ("Horsham") and Borough of Ambler ("Ambler"). Mr. Speers' drinking water was provided by Ambler. Mssrs. Bien and Field were exposed to Defendants' products via drinking water obtained from Horsham. To prove their exposures, each Plaintiff relies on the same experts (*i.e.*, Christopher P. Higgins, Ph.D. and Anthony Brown) to establish the fate

---

[12] Accordingly, the evidence regarding fate and transport would be virtually identical whether one case is tried or five (or any number in between). The hydrogeology of the area surrounding the military bases and hydrogeological pathways to drinking water sources are all interrelated. In this regard, it is important to note that Defendants may argue that trials involving multiple water districts would complicate matters. In fact, the opposite is true. It would be to a jury's *detriment* and to Plaintiffs' prejudice if the jury were to hear of and see only a partial picture of the surrounding hydrogeology. Even if it were only one Plaintiff at issue, the jurors in such a case would necessarily have to hear of the evidence of the contamination and the hydrogeology for the entire area in order to best be able to judge the evidence. Moreover, the scope of the contamination is part of the proverbial story that speaks to the conduct and potential evidence supporting Plaintiffs' punitive damages claims. Thus, an argument that a trial involving multiple water districts would *complicate* rather than maximize efficiency rings hollow.

[13] It should be noted that Plaintiff's counsel for Rodney Hartman did not submit expert reports since it was recognized following case-specific discovery that Mr. Hartman's testicular cancer claim does not qualify as an AFFF exposure case as required under CMO 26 [ECF No. 3080].

and transport of Defendants' products from their source to Plaintiffs' homes, which, as Plaintiffs note, in footnote 13, *supra*, requires discussion of the overall hydrogeological pathways in the area surrounding the military bases for a jury to best understand the underlying science. Moreover, Defendants have presented experts (*e.g.*, Russell Abell, P.G., LSP and Tiffany Thomas, PhD) to evaluate the fate and transport and distribution of PFAS within drinking water to each Plaintiff's residence and places of work in vicinages supplied by all these municipal water authorities, which importantly, puts all three (3) water suppliers at issue whether these actions were to be tried individually or jointly.

Plaintiffs anticipate that Defendants will argue that these cases are not appropriate for consolidation for a host of reasons, which may include the Plaintiffs' different medical histories, care, and treatment. These individual differences are neither surprising nor do they make the cases inappropriate for consolidation. If these arguments were to be accepted, there is no circumstance under which individual product liability personal injury cases could ever be consolidated. But that is clearly not the case. In the context of litigations involving numerous plaintiffs alleging personal injuries caused by defective products or toxic exposures, consolidated trials are an accepted procedure to conserve judicial resources, the resources of the parties, and ensure that individual cases are tried in a timely manner.[14]

---

[14] *See, e.g., Campbell*, 882 F.3d at 76 (finding it "inconceivable" that district court abused its discretion by consolidating four plaintiffs' product liability cases for trial); *Laughlin v. Biomet Inc.*, No. ELH-14-1645, 2020 WL 1307397, at *7 (D. Md. Mar. 18, 2020) ("the existence of facts unique to each plaintiff does not preclude consolidation. Were it otherwise, consolidation would never occur in products liability litigation.") (citing *Blount v. Bos. Sci. Corp.*, No. 1:19-CV-0578 AWI SAB, 2019 WL 394387, at *4 (E.D. Cal. Aug. 21, 2019) (consolidating four transvaginal mesh cases)); *Neal v. Carey Canadians Mines, Ltd.*, 548 F. Supp. 357, 365 (E.D. Pa. 1982), aff'd, 760 F.2d 481 (3d Cir. 1985) (consolidated trial of 15 asbestos plaintiffs decided under Pennsylvania law).

As *Campbell* instructs, when causes of action involve common witnesses, identical evidence, and similar issues, judicial economy will generally favor consolidation.[15] Earlier in these bellwether proceedings, the Court pondered whether "[t]o have maybe 5 plaintiffs with fairly similar claims from a common alleged contamination source," consolidated for trial, provided it is "digestible to the jury."[16] And more recently, it has weighed having just a one plaintiff trial where defendants would "try to make that person a unicorn," against a consolidated multi-plaintiff trial, which "really focuses more on the science of whether there's causation here."[17] Plaintiffs submit that a consolidated multi-plaintiff trial of the five bellwether Plaintiffs better serves the purposes of this MDL and can be accomplished with minimal jury confusion and maximal benefit to all stakeholders.

### III. ARGUMENT

#### A. Consolidation of the Bellwether Plaintiffs for Trial Is Appropriate

Rule 42(a) governs consolidated proceedings, and it provides:

If actions before the court involve a common question of law or fact, the court may:

(1) join for hearing or trial any or all matters at issue in the actions;
(2) consolidate the actions; or
(3) issue any other orders to avoid unnecessary cost or delay.[18]

---

[15] *Campbell*, 882 F.3d at 75-76. *See also Pariseau v. Anodyne Healthcare Mgmt.*, Inc., No. 3:04cv630, 2006 WL 325379, at *1 (W.D.N.C. Feb. 9, 2006) (citing *Arnold v. E. Air Lines*, 681 F .2d 186, 193 (4th Cir.1982)).

[16] *See* Oct. 21, 2022 Status Conf. Hrg. Trans. at 6. *See also* Sept. 23, 2022 Status Conf. Hrg. Trans. at 29 ("But I wouldn't do multiple plaintiffs without having a lot of commonality on the disease processes and location. *** But it might be persuasive if there's enough differences on some of these that the jury verdicts could be very instructive.").

[17] Apr. 4, 2025 Status Conf. Hrg. Trans. at 23.

[18] Fed. R. Civ. P. 42(a).

Under controlling Fourth Circuit precedent, when considering whether to consolidate several actions for trial, this Court must consider "whether the specific risks of prejudice and possible confusion" from consolidation "were overborne by the risk of inconsistent adjudications ..., the burden on parties, witnesses, and available judicial resources posed by multiple lawsuits, the length of time required to conclude multiple suits as against a single one, and the relative expense to all concerned of the single-trial, multiple-trial alternatives."[19]

**1. A Consolidated Trial Limited to the Five Bellwether Plaintiffs Will Not Prejudice the Defendants, Nor will it Confuse the Jury**

All of the claims to be presented by the Bellwether Plaintiffs at trial are derived from the same conduct by the Defendants. The use of their products at Willow Grove resulted in groundwater contamination. Plaintiffs' exposures to these contaminants allegedly caused them to develop kidney or testicular cancer. Instead of five juries hearing the same evidence, Plaintiffs submit that one jury can more efficiently hear the evidence and make individual determinations of causation and damages to the benefit of all. Multiple procedural safeguards can be employed during the proceedings to avoid prejudice against the defendants and jury confusion, *e.g.*, proper *voir dire*, limiting instructions, jury instructions, special interrogatories, and verdict sheets. Several of these safeguards -- principally jury instructions[20] -- were recognized as being effective to eliminate these concerns in *Campbell* while ensuring a fair trial:

---

[19] *Campbell*, 882 F.3d at 74 (quoting *Arnold v. Eastern Air Lines, Inc.,* 681 F.3d 186, 193 (4th Cir. 1982)), *rev'd on other grounds*, 712 F.2d 899 (4th Cir. 1983) (en banc).

[20] Articulating unfounded speculation about jury confusion runs counter to controlling authority. *See Opper v. United States*, 348 U.S. 84, 95 (1954) ("To say that the jury might have been confused amounts to nothing more than an unfounded speculation that the jurors disregarded clear instructions of the court in arriving at their verdict. Our theory of trial relies upon the ability of a jury to follow instructions."). Should Defendants so speculate, any inferential argument is invalid; each must be demonstrated with evidence. *Campbell*, 882 F.3d at 75.

9

>Of course, regardless of efficiency concerns, consolidation is not appropriate if it would deny a party a fair trial. Alert to this risk, the district court endeavored throughout the trial to limit any potential jury confusion or prejudice resulting from the consolidation. At the outset of trial, the district court instructed the jury that the trial concerned four separate claims and informed them that they must treat each as "as if each have been tried by itself." J.A. 1705–06. During the trial, BSC had the opportunity to address each plaintiff's claims independently, and in fact pursued a comparative negligence defense as to one plaintiff that it did not pursue as to the other plaintiffs. Following trial and prior to jury deliberations, the district court emphasized that the jurors were not to "even consider that more than one claim was brought" in weighing the evidence and that they must consider each case separately. J.A. 1084. To promote independent review of each case, the district court made use of special interrogatories on separate verdict forms for each plaintiff.[21]

Courts have recognized that the consolidation of cases involving personal injuries for trial is an extremely useful procedural tool with any potential prejudice overcome by consistent adjudications of common factual and legal issues and the judicial efficiencies achieved.[22]

---

[21] *Campbell*, 882 F.3d at 74-75. Other courts have employed similar measures. *See, e.g., Neal*, 548 F. Supp. at 383 (noting the use photographs and individual summary sheets for each plaintiff); *Blount*, 2019 WL 3943872 at *4 ("The Court concludes that any danger [of jury confusion or prejudice] that is present can be sufficiently alleviated through jury instructions and the trial process."); *Suhn v. Breg, Inc.*, No. 08-4190-KES, 2011 WL 1527263, at *2 (D.S.D. Apr. 20, 2011) (noting the use of "proper questioning techniques and identification of exhibits").

[22] *See, e.g., In re Dow Corning Corp.*, 211 B.R. 545, 581-89 (Bankr. E.D. Mich. 1997) (consolidating cases of 588 breast implant plaintiffs), *Suhn*, 2011 WL 1527263, at *2 (consolidation of 2 shoulder pain pump cases for trial); *McClellan v. I-Flow Corp.*, No. 6:07-cv-1309, 2010 WL 11595942, at *3 (D. Or. July 23, 2010) (consolidating two sets of multiple plaintiffs' cases alleging chondrolysis caused by a shoulder pain pump). Courts have regularly consolidated for trial product liability actions involving multiple plaintiffs alleging similar injuries caused by the same products, including: "popcorn lung" arising out of inhalation of diacetyl, e.g., *Blood v. Givaudan Flavors Corp.*, 2009 WL 982022 (N.D. Iowa Apr. 10, 2009); multi-defendant actions involving defective paint product, *Cruickshank v. Clean Seas Co.*, 402 F.Supp.2d 328 (D. Mass. 2005); and pharmaceutical product liability actions, *Kershaw v. Sterling Drug, Inc.*, 415 F.2d 1009 (5th Cir. 1969). There are also many examples of the effective use of Rule 42 consolidation in cases involving exposure to asbestos. *See, e.g., Cimino v. Raymark Industries, Inc.*, 151 F.3d 297 (5th Cir. 1998); *In re: Asbestos Litig.*, 173 F.R.D. 81 (S.D.N.Y.1997); *Carpenter v. GAF Corp.*, 1994 WL 47781 (6th Cir. 1994) (unpublished); *Johnson, supra*; *Neal, supra*.

Other MDL Courts have also ordered the consolidation of multiple cases specifically for purposes of "bellwether" trials in the context of MDL product liability proceedings. In *In re: Welding Fume Prods. Liab. Litig.*, MDL 1535, 2006 WL 2869548 (N.D. Ohio Oct. 5, 2006), the court concluded that the benefits of a consolidated bellwether trial of two MDL plaintiffs claiming injury under the same state law outweighed any potential risk of confusion of the jury or prejudice to the defendant. In *In re Stand 'N Seal Prods. Liab. Litig.*, MDL 1804, 2009 WL 2224185, *2 (N.D. Ga. July 21, 2009), the Court denied the defendant's motion to order separate trials for seven MDL plaintiffs who asserted similar claims involving a common product. The court there observed that based on the similarity of the plaintiffs' claims, "separate trials would require redundant testimony that is not in the interest of judicial economy." *Id*. While the court acknowledged "some risk of jury confusion and prejudice [to the defendant manufacturer]," it concluded "that risk is minimized by the straightforward nature of the Plaintiffs' claims and the appropriate use of jury instructions." *Id*.[23]

State court consolidated proceedings have likewise found joint trials appropriate. For example, in *In the Dalkon Shield Litigation* where women developed pelvic inflammatory disease ("PID") from use of the defendant's intrauterine device ("IUD"), the court of appeals in California upheld consolidation of three plaintiffs' actions based on the fact that "a large portion of the trial

---

[23] In ordering consolidation in *Stand n' Seal*, the court relied on *Hanley v. First Investors Corp.*, 151 F.R.D. 76, 80 (E.D. Tex.1993), wherein the district court rejected the defendants' arguments of undue prejudice and potential for confusion in opposition to consolidation of nineteen plaintiffs for trial, and observed "[b]ased on the court's experience, it seems well within the jury's abilities to distinguish between the idiosyncrasies of each case." *See also Avance v. Kerr-McGee Chemical, LLC*, 241 F.R.D. 585, 587 (E.D. Tex. 2006) (denying defense motion for separate trials of five plaintiffs, each of whom resided in same residence and were thereby exposed to defendant's product – creosote and pentachlorophenol – even though exposure occurred at different times over time span of several decades and although each plaintiff suffered different injuries ranging from cancer to birth defects).

would be devoted to issues common to the three cases," and thus consolidation would avoid repetition of presentation of such evidence. *Todd-Stenberg v. Dalkon Shield Claimants Trust,* 48 Cal.App.4th 976, 980 (Cal. App. 1 Dist. 1996). Based on similar reasoning, the court in *Batson v. Lederle Laboratories*, 290 N.J. Super. 49, 55 (N.J. Super. App. 1996), found no reason to conduct two trials on the same issues. Finally, in the New Jersey state court Levaquin litigation, *In re Levaquin Litig.*, Case No. 286 (N.J. Super. Law Division May 3.2011), Judge Higbee consolidated the first two bellwether cases for a joint trial.[24] Thus, examples of joint trials being permitted are plentiful, including serving as the first bellwether trial in a state court litigation.

The rationale behind these cases applies here. As the parties in these bellwether cases have all waived *Lexecon* rights, this Court has the opportunity to resolve five cases in one proceeding. While any consolidated trial harbors some risk, as these authorities show, the benefit from proceeding with one consolidated trial versus five separate trials outweighs these risks.

**B. Consolidation Will Reduce the Burden on the Court, the Witnesses and the Parties**

The advantages of consolidating similar cases for trial, including avoidance of repetitious presentation of facts and the consequent reduction of the burden and expense for all parties inherent in trying cases separately that involve common facts, are amplified when the number of cases exceeds the number that could reasonably be tried individually. For example, in his concurrence in *In re: Tobacco Litigation*, 218 W.Va. 301, 307-08 (2005), former Justice Starcher of the West Virginia Supreme Court observed the following with reference to the evolution of consolidated asbestos trials in West Virginia:

> Circuit courts started to try the cases one at a time, but quickly abandoned that route; trying each case would have required hundreds of years. The same lawyers

---

[24] *In Re Levaquin Litigation*, Case No. 286, Amended Order Consolidating Cases for Trial, attached as Ex. B.

and the same witnesses were employed, using the same documents and evidentiary exhibits, on a full-time basis in counties throughout the State. Every trial involved weeks of testimony to try the same issues about the same defendants again and again and again. Virtually everything pertaining to the defendants remained the same. The only issue that changed concerned the plaintiffs….

The lessons learned from asbestos litigation and similar large scale mass torts are instructive and applicable here. As Justice Starcher recognized, Rule 42 consolidation is available specifically to eliminate the sort of redundancy and resulting onerous expense and backlog that would result from trying the same liability in these cases over and over.[25]

As noted above, the liability and general causation witnesses for both plaintiffs and defense are the same. Consolidation will reduce the burden on the witnesses. Regarding Plaintiffs' causation experts, Joseph M. Braun, RN, MSPH, PhD (epidemiology), David H. Sherman, PhD (mechanism of action), Ronald J. Kendall, Ph.D. (toxicology), and David L. MacIntosh, ScD, CIH, DABT (exposure) are slated to testify on behalf of all Plaintiffs. In addition, Plaintiffs' specific causation expert, Dr. Robert Bahnson, would testify to many matters of medicine and science regarding PFAS and its association with kidney and testicular cancer that are *identical* for each, including the differential diagnosis or methodology by which Dr. Bahnson reached his specific causation conclusions for each Plaintiff. These professionals have busy practices, teaching schedules, or other professional responsibilities. The reduction in the expenditure of their time if the cases were consolidated would substantially reduce the burden placed on Plaintiffs as the cost of expert witnesses is one of the major expenditures of trying a product liability case. The reduction

---

[25] *Id*. at 308; *see also, Wilson v. Johns-Manville Sales Corp*., 107 F.R.D. 250, 252 (S.D. Tex. 1985) ("The Court's consolidation will save these defendants the expense of litigating the [common] issues of product defectiveness and punitive damages in 50 separate trials."); *In re Joint Eastern and Southern Dists. Asbestos Litig.*, 125 F.R.D. 60, 63 (E.D.N.Y. 1989) ("Consolidation will result in substantial time-savings….When six to eight claims are consolidated for trial, [common evidence] can be presented once rather than six to eight times in individual trials.").

in cost of having these experts prepare and testify once, rather than five times, will be a significant savings to the Plaintiffs, and likely to the Defendants as well.

Accordingly, the standards of Rule 42(a) are satisfied, and this Court should consolidate these actions for a unitary bellwether trial. Alternatively, this Court should consider consolidating the actions according to their cancers, *i.e.*, a unitary trial for the three (3) kidney cancer Plaintiffs (Donnelly, Speers, and Voelker) and a unitary trial for the two (2) testicular cancer Plaintiffs (Bien and Field). In that regard, it is Plaintiffs' understanding that both the DCC and PEC agree that the *Voelker* case, which involves kidney cancer, should be a trial selection.[26] Therefore, it would seem prudent, should the Court alternatively consider a unitary trial according to a specific cancer, that we proceed first with the three (3) kidney cancer Plaintiffs, as it is clear that the DCC is agreeable to kidney cancer as a first bellwether. Finally, it is worth noting that the third-party vendor assessing the Plaintiff Fact Sheet responses has determined there are far more kidney cancer cases filed than testicular cancer cases, and thus underscoring why kidney cancer should get priority.

C. **The Five Bellwether Cases are Representative and Therefore Appropriate Bellwether Trial Selections**

All five (5) of these bellwether cases are appropriate bellwether trial selections because they are representative of the overall docket, which is the cornerstone of an appropriate bellwether trial selection.[27]

---

[26] As noted below, the *Voelker* case requires discussion of all three (3) districts at issue in these five (5) cases because Mr. Voelker was exposed to AFFF-contaminated drinking water from Ambler, WMA, and Horsham. Given this, selection of the *Voelker* case alone will require discussion of all three (3) relevant water authorities.

[27] For any bellwether process to be successful, the cases that populate the bellwether pool must be representative of the overall docket. *See In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.,* MDL No. 2100, 2010 U.S. Dist. LEXIS 108107, at *4, *6-7 (S.D. Ill. Oct. 8, 2010) (it is "critical to a successful bellwether plan that an honest representative sampling of cases be achieved" because "[l]ittle credibility will be attached to this process, and it will be a waste of everyone's time and resources, if cases are selected which do not accurately reflect the

1. **<u>Kidney Cancer Trial Selections:</u>**

    - <u>Speers</u>: Mr. Speers alleges kidney cancer resulting from drinking AFFF-contaminated drinking water from Ambler for approximately twenty-four (24) years prior to his kidney cancer diagnosis. The fact that Mr. Speers is male renders his case representative as kidney cancer is more likely to occur in men than in women. Additionally, Mr. Speers' kidney cancer treatment and follow-up was typical of most kidney cancers. In particular, he underwent a surgical procedure to remove the cancer (partial nephrectomy) and received neither chemotherapy nor radiation as part of his treatment course, which is a very typical kidney cancer course. Finally, like most kidney cancer cases, Mr. Speers was required to follow a post-surgical surveillance plan with regular imaging. In addition, Mr. Speers underwent genetic testing, which identified a rare gene mutation, FH, that, according to scientific and medical literature, is not established as having an association with kidney cancer.[28]

    - <u>Donnelly</u>: Mr. Donnelly alleges kidney cancer resulting from drinking AFFF-contaminated water from WMA for approximately twenty-four (24) years prior to his kidney cancer diagnosis. Again, simply by being male, Mr. Donnelly's case is typical as kidney cancer is more likely to occur in males than females. Mr. Donnelly also underwent a surgical procedure to treat his kidney cancer (radical nephrectomy) but received neither chemotherapy nor radiation, again rendering his case typical for kidney cancer. Finally, like Mr. Speers, Mr. Donnelly was required to follow a post-surgical surveillance plan with regular imaging, again underscoring the representativeness of his case. Mr. Donnelly also underwent genetic testing, which was negative. In addition to his two-plus decades of exposure to high levels of PFAS, Mr. Donnelly had the common risk factor of an elevated BMI of 32.7 (obesity class 1 of 3) at the time of his diagnosis. Mr. Donnelly has no additional risk factors.

    - <u>Voelker</u>: Mr. Voelker alleges kidney cancer resulting from drinking AFFF-contaminated water from residences serviced by WMA, and workplaces serviced by WMA, Ambler, and Horsham over the course of nearly thirty (30) years prior to

---

run-of-the-mill case"); *see also*, Guidelines & Best Practices for Large & Mass-Tort MDLs, Bolch Judicial Institute, Duke Law School 18-19 (2d ed 2018)("[T]he bellwether process will be valuable only if the cases selected for trial are truly representative of the whole (or of one or more distinct categories of cases that comprise the whole.")).

[28] Regarding the FH gene mutation, the genetic testing report indicates as follows: "This variant has been reported in *rare* cases of isolated renal cancer but is *absent* from other large studies of patients with renal cancer. In addition to this *equivocal clinical evidence*, the common frequency in the general population provides *insufficient evidence* to demonstrate that the [variant] causes Hereditary Leiomyomatosis and Renal Cell Carcinoma syndrome (HLRCC). Taken together, *this variant is not expected to be associated with HLRCC* and screening for cancers associated with HLRCC is not indicated." [emphasis added; internal citations removed]. MyRisk Genetic Result for Mr. Speers, dated Jan. 29, 2025, at 1, attached as Ex. C.

his kidney cancer diagnosis. Like most kidney cancer cases, Mr. Voelker is male, rendering his case typical. Moreover, Mr. Voelker underwent a surgical procedure to treat his kidney cancer (partial nephrectomy), but also, typically, received neither radiation nor chemotherapy. Also, as is customary, after his surgery Mr. Voelker was required to follow an imaging protocol, further rendering his case representative. Mr. Voelker has several additional claimed risk factors or "background noise,"[29] including very common conditions such as an elevated BMI of 36.9 at time of diagnosis (obesity class 2 of 3) and hypertension. Mr. Voelker has likewise been identified as having a rare gene mutation (CHEK2) that has not been generally established as a risk factor for kidney cancer.[30]

These three kidney cancer cases together are a representative sample of the typical array of kidney cancer cases more broadly, with varying degrees of exposure and varying common potential risk factors. There is simply no single case that is representative of the entire population of kidney cancer patients with a history of PFAS exposure, and, trying these three together would give the parties the most informative result, thereby best serving the very purpose of the bellwether process.

   **2. <u>Testicular Cancer Trial Selections</u>:**

   - *Bien*: Mr. Bien alleges testicular cancer resulting from drinking AFFF-contaminated water from Horsham for approximately five (5) years prior to his testicular cancer diagnosis. Following his diagnosis, like most testicular cancer cases, Mr. Bien had a surgical procedure to remove the cancer (left radical inguinal orchiectomy). As is typical with testicular cancer cases, Mr. Bien underwent chemotherapy following his surgical procedure, which further renders his case representative. Finally, and, again, as is unfortunately typical with testicular cancer cases, Mr. Bien experienced post-diagnosis infertility. In addition to his exposure

---

[29] Of the three kidney cancer bellwethers, Mr. Voelker's case presents a more complicated medical history, albeit with conditions common in the general population and among kidney cancer patients generally. The Court has indicated in the past that, "I want as little background noise as possible, cases selected that answer that basic question [of general and specific causation]." July 19, 2024 Status Conf. Hrg. Trans. at 7. While Mr. Voelker's case does contain some "background noise," such as an elevated BMI and hypertension, these are not uncommon in the overall docket and/or the general population and therefore remains representative, albeit with more risk factors than Donnelly or Speers.

[30] Regarding the CHEK2 gene mutation, the genetic testing report indicates as follows: "Some studies have described a *possible* increased risk for a wide range of cancers in patients with CHEK2 mutations, including prostate, gastric, thyroid, renal, hematological malignancies, testicular germ cell tumors, and other malignancies. *However, these studies are not conclusive and there are currently no medical management guidelines to address these possible risks*." [emphasis added]. MyRisk Genetic Result for Mr. Voelker, dated Jan. 29, 2025, at 7, attached as Ex. D.

to high levels of PFAS, the fact that Mr. Bien was a 30-year-old white male at diagnosis renders his case representative as testicular cancer is more likely to occur in white men between the ages of 20 and 34. Given the presence of these common facts, Mr. Bien's case is clearly representative.

- *Field*: Mr. Field alleges testicular cancer resulting from drinking AFFF-contaminated water for approximately twenty-four (24) years prior to his testicular cancer diagnosis. Similar to Mr. Bien, Mr. Field underwent a surgical procedure to remove his testicular cancer (left inguinal radical orchiectomy). Further, as is typical, Mr. Field underwent adjuvant chemotherapy following his orchiectomy. Sadly, as is common, Mr. Field also experienced post-diagnosis infertility further underscoring the representative nature of his case. In addition to his two-plus decades of exposure to high levels of PFAS, the fact that Mr. Field was a 27-year-old white male at diagnosis renders his case representative as testicular cancer is more likely to occur in white men between the ages of 20 and 34.

Plaintiffs submit that the above slate of five representative bellwether trial cases should be consolidated for the first personal injury bellwether trial. Given the commonality of facts and law across the five cases and the representative nature of the proposed trial selections, consolidation of these cases would promote the efficient nature of this phase of the MDL and serve the underlying purpose of a bellwether trial for addressing *Leach* cancer claims, *i.e.*, provide valuable information and insight into the strengths and weaknesses of Plaintiffs' personal injury cases that can be extrapolated to the overall MDL docket.

## IV. CONCLUSION

For the reasons set forth above, Plaintiffs' motion should be granted and this Court should consolidate these actions for a unitary bellwether trial. Alternatively, Plaintiffs request the Court consolidate the actions according to their cancers, *i.e.*, a unitary trial for the three (3) kidney cancer Plaintiffs (Donnelly, Speers, and Voelker) and a unitary trial for the two (2) testicular cancer Plaintiffs (Bien and Field), in addition to such other and further relief this court deems just and proper under the circumstances.

Dated: May 6, 2025                                                             Respectfully submitted,

<div style="margin-left:40%">

*s/ Fred Thompson, III*
Fred Thompson III
Motley Rice LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464
P: (843) 216-9658
fthompson@motleyrice.com

*Plaintiffs' Liaison Counsel*

Michael A. London
Douglas and London PC
59 Maiden Lane, 6th Floor
New York, NY 10038
P: 212-566-7500
mlondon@douglasandlondon.com

*Attorneys for Plaintiff Speers*

Scott Summy
Baron & Budd, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
P: 214-521-3605
ssummy@baronbudd.com

Joseph F. Rice
Motley Rice LLC
28 Bridgeside Blvd.
Mt. Pleasant, SC  29464
P: (843) 216-9118
jrice@motleyrice.com

*Co-Lead Counsel for Plaintiffs*

Nancy M. Christensen, Esq.
Weitz & Luxenberg, P.C.
700 Broadway
New York, NY  10003
P: (212) 485-1897
nchristensen@weitzlux.com

*Attorneys for Plaintiffs*
*Alex Field, Brock Donnelly,*
*and Michael Bien*

</div>

Lawrence R. Cohan, Esq.
Saltz Mongeluzzi Bendesky
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, PA 19103
P: (215) 486-8282
lcohan@smbb.com

*Attorneys for Plaintiff Kevin Voelker*

**CERTIFICATE OF SERVICE**

    I hereby certify that a true and correct copy of the foregoing was electronically filed with this Court's CM/ECF on this 6th day of May 2025 and was thus served electronically upon counsel of record.

                                                    */s/ Fred Thompson, III*
                                                    Fred Thompson